IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIDELITY INFORMATION SERVICES, INC., | : : : : |
| Plaintiff, | : : **Index No.** |
| vs. | : : |
| KARA S. KATZ; JAY KATZ; and STORM NETWORKS, LLC, | : : : |
| Defendant. | |

## COMPLAINT

Plaintiff, Fidelity Information Services, Inc., ("FIS"), by its attorneys, Dewey & LeBoeuf LLP, for its Complaint herein against defendants Kara S. Katz ("Kara Katz"), Jay Katz ("Jay Katz") (together, the "Katzes"), and Storm Networks, LLC ("Storm") (collectively with the Katzes, "Defendants"), alleges as follows:

### PRELIMINARY STATEMENT

1. This is a diversity action seeking damages and injunctive relief for 1) breach of contract; 2) breach of implied covenant; 3) tortious interference with contractual relations; and 4) a permanent injunction.

2. Plaintiff brings this action to stop an ongoing breach of a multi-million dollar purchase agreement. That breach threatens to undermine the value of a business unit that FIS bought for more than $30 million and into which it has subsequently invested substantial additional resources to develop and expand.

3. On December 10, 2004, FIS entered into a purchase agreement ("Purchase Agreement") with defendant Kara S. Katz and others to purchase Clear Par, LLC ("Clear Par" or the "Company"). A copy of the Purchase Agreement is attached hereto as Exhibit 1. At the time of the transaction, Kara Katz owned a one-third share of Clear Par.

4. Clear Par's primary business is the provision of a web-based commercial loan settlement system dedicated to the efficient settlement of par loan closings in the primary syndication and secondary loan trading markets. A par loan is a loan that is expected to trade at a value of 100 cents on the dollar if it is sold into the secondary market. FIS purchased Clear Par to help strengthen its market share and presence in commercial lending and trading. FIS offers its services to the market under the product name "ClearPar."

5. The Purchase Agreement contained several clauses designed to protect the parties' interests and Clear Par's assets, including its intellectual property. In the Purchase Agreement, Kara Katz and the other two co-owners pledged to keep proprietary information confidential and not use or disclose it in any way. The sellers also agreed not to engage directly or indirectly in any competitive businesses. The sellers, including Kara Katz, were bound by these promises for a period of five years following the close of the transaction.

6. After the sale, defendant Jay Katz, one of Clear Par's former officers, and Kara Katz's husband, started a New York-based technology business originally named Quartet Financial Networks, LLC and now named Storm Networks, LLC ("Storm") in conjunction with three of Clear Par's customers, Bank of America, Credit Suisse, and Morgan Stanley. Storm is a direct competitor of Clear Par.

7. Storm aims to reduce transaction times and settle par and distressed loans more efficiently through its online platform by introducing a proprietary Master Agreement. The Master Agreement will standardize trading terms across all trades conducted by Storm, thus speeding the settlement process.

8. Kara Katz is directly assisting Storm by drafting and otherwise supporting the development of the Master Agreement.

9. FIS has recently learned that Storm is about to implement the use of the Master Agreement, as well as enter into a purchasing or financing transaction with third parties which would expose FIS's proprietary information to competitors.

10. FIS has been harmed by Kara Katz's breach of the Purchase Agreement's protective provisions, and by Jay Katz and Storm's usurpation of the proprietary information and customer contacts of Clear Par. FIS paid millions of dollars for Clear Par in reliance on the Purchase Agreement's guarantee that information related to Clear Par's business would remain confidential and that Kara Katz and the other Sellers would not compete with FIS.

11. FIS will suffer irreparable harm if Kara Katz continues to work on behalf of Storm, if Jay Katz and Storm implement the Master Agreement and continue to benefit from Kara Katz's prohibited competitive efforts, if Jay Katz and Storm are permitted to retain the work-product wrongfully obtained in violation of the Purchase Agreement, and if Storm is sold, which would disperse critical elements of Clear Par's business into the market for use by its competitors.

## THE PARTIES

12.  Plaintiff FIS is incorporated in Arkansas and has its principal executive office in Jacksonville, Florida. FIS is the world's top-ranked technology products and services provider to the banking industry and offers a comprehensive commercial lending and trading system from deal building through services and trading. FIS operates in many markets, including commercial lending, community banking, and loan syndication and trading.

13.  Defendant Storm is a limited liability corporation incorporated in Delaware with an office located at 17 Skyline Drive, Hawthorne, New York. Storm is a technology company developed in conjunction with, and co-owned by, Bank of America, Credit Suisse, and Morgan Stanley. According to Storm's website, it "will provide buy-side and sell-side participants in syndication and secondary loan markets with document management, workflow tools and real-time data for integrated trade matching, primary and secondary trade settlement, inventory, position reconciliation and credit documentation." Thus, in its own terms, Storm is a direct competitor with Clear Par.

14.  Defendant Kara Katz resides at 38 Highland Road, Westport, Connecticut. Prior to executing the Purchase Agreement, Kara Katz owned a one-third equity share in Clear Par. Currently, Kara Katz is a managing partner of the law firm Mandel, Katz & Brosnan LLP, which describes itself as "an international law firm dedicated to assisting clients in a wide variety of high-yield investment transactions, from secondary loan and bankruptcy and insolvency claims trading to structured asset disposition transactions, private equity investments and debtor-in-possession financing."

15. Kara Katz works in the New York office of Mandel, Katz & Brosnan LLP, which is located at 210 Route 303, Valley Cottage, New York.

16. Defendant Jay Katz resides at 38 Highland Road, Westport, Connecticut. Jay Katz was employed by Clear Par as its Chief Information Officer ("CIO") and remained in that position for approximately one year after the Company's sale. Currently, Jay Katz is the managing director and an equity owner of Storm.

17. As the managing director of Storm, Jay Katz works in Storm's office, which is located at 17 Skyline Drive, Hawthorne, New York

18. Defendant Kara Katz is married to defendant Jay Katz.

## JURISDICTION AND VENUE

19. This Court has jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff, incorporated in Arkansas with its principal executive office located in Florida, is diverse from defendants Kara Katz and Jay Katz, both residents of Connecticut, and defendant Storm Networks, LLC, incorporated in Delaware with its principal office located in New York. The amount in controversy exceeds $75,000.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and because all of the events giving rise to this Complaint occurred in New York. Additionally, the Purchase Agreement governing this dispute contains a forum selection clause establishing that the United States District Court for the Northern District of New York shall be a proper venue for any legal action brought by the parties to the Purchase Agreement and arising out of the Purchase Agreement.

## FACTUAL ALLEGATIONS

I.  **CLEAR PAR'S BUSINESS**

21. Clear Par was founded in June of 2000 by members of Kara Katz's law firm, then known as Mandel, Katz, Manna & Brosnan, LLP. All of the membership interests in Clear Par were owned by Bocce CP, LLC ("Bocce"), a New York limited liability company. Bocce's Class A Members were Kara Katz, Michael J. Mandel, and John J. Manna, Jr. As a result, Clear Par was wholly owned by Kara Katz, Michael J. Mandel, and John J. Manna, Jr. (collectively with Bocce, "Sellers").

22. Jay Katz, Kara Katz's husband, acted as Clear Par's CIO for approximately two and one-half years. Jay Katz left Clear Par in or around December 2005.

23. ClearPar is a web-based commercial loan settlement system dedicated to the efficient settlement of par loan closings in the primary syndication and secondary loan trading markets. ClearPar's Mission Statement, available on its website, recognizes the importance of having trades "settle within days rather than weeks." To that end, the Company aims "to promote efficiency and liquidity in the corporate loan market by reducing settlement time for secondary trades and syndications, thereby reducing settlement risk and cost."

24. The Company's system handles trades from start to finish by "simplif[ying] trade settlement by providing an integrated, collaborative, real-time environment for buyers and sellers to create, review, approve, and execute secondary trade and syndication documents." ClearPar's products are "designed in all facets to

6

improve liquidity and efficiency in the par loan market and allow for greater trading volume" by providing "up-to-the-minute status of open trades as well as historical recordkeeping for closed transactions."

25. Once a financial institution registers with ClearPar, it receives a user ID and password with which it logs onto ClearPar's website to complete an electronic trade ticket. ClearPar's system generates a trade confirmation, acceptance agreement, and funding memorandum, then automatically notifies each counterparty and agent that documents are available to review. As counterparties review and edit documents, ClearPar automatically updates the documents. When a trade has closed, ClearPar transfers it from open to closed and stores all signed, final documentation electronically.

26. ClearPar has provided its services to over 300 institutional investors, who together manage over 1000 mutual, hedge, and other investment funds.

27. Clear Par was one of the first companies engaged in the electronic loan settlement industry, which was initially slow to grow as investors were hesitant to switch from paper trades to electronic trades. However, ClearPar slowly built itself into an industry leader. Now, paper trades are becoming obsolete and ClearPar has captured a significant market share valued in 2006 at over $250 billion. An article outlining the transition from paper loan settlement to electronic loan settlement is attached hereto as Exhibit 3.

## II.  THE SALE OF CLEAR PAR

28. On December 10, 2004, FIS entered into a Purchase Agreement with the Sellers for the purchase of Clear Par. FIS paid Sellers approximately $33 million in exchange for the Company.

29. After the sale, Jay Katz remained employed as Clear Par's CIO until approximately December 2005.

30. To protect the assets of Clear Par, the Purchase Agreement contained several clauses designed to preserve proprietary information, including covenants of confidentiality and non-competition. These covenants bind the Sellers for a period of five years after the closing, i.e., until December 10, 2009.

31. Under the Purchase Agreement's Covenant of Confidentiality, Kara Katz pledged not to "(i) use for any purpose, (ii) disclose to any person, or (iii) keep or make copies of documents, tapes, discs or programs containing, any confidential information concerning the Company. For purposes hereof, 'confidential information' shall mean and include, without limitation, all Company Intellectual Property which the Company owns, all customer lists and customer information…all other information concerning the Company's processes, apparatus, equipment, packaging, products, marketing and distribution methods."

32. The Purchase Agreement also includes a customer list, contained in Schedule 2.15, which lists among others Bank of America, Morgan Stanley Senior Funding, Morgan Stanley (Nova Scotia), Morgan Stanley Emerging Markets, Morgan Stanley Bank International Limit, and Credit Suisse First Boston. Because of the sensitive nature of the client lists attached to the Purchase Agreement, Schedule 2.15 has not been submitted with this complaint. Defendant Kara Katz is already in possession of this information and FIS will file the schedule under seal once an order can be entered.

33. The Purchase Agreement's Covenant of Non-Competition, contained in paragraph 4.9(c), provides that "[w]ithout the express prior written consent of the Buyer

[FIS], no Seller Party shall…directly or indirectly, own, manage, control or participate in the ownership, management or control of, or be related or otherwise affiliated in any manner with, any business substantially similar to that presently engaged in by the Company."

34. By signing the Purchase Agreement, Kara Katz agreed not to use or disclose information about Clear Par, including information related to the customers listed in Schedule 2.15, in any way. Kara Katz also expressly agreed not to compete with Clear Par. Kara Katz is bound by the covenants of confidentiality and non-competition until December 10, 2009, the expiration date of the covenants.

35. These restrictive covenants were designed to benefit FIS by preventing Sellers from later usurping away portions of the business they purported to transfer. This exclusivity allowed Sellers to receive greater consideration for the sale of Clear Par by enabling them to transfer their interest fully in the business they had developed.

36. The Purchase Agreement provides that any violation or breach of the Purchase Agreement's non-competition clauses would "result in irreparable injury to the Buyer for which a remedy at law would be inadequate and that, in addition to any relief at law which may be available to the Buyer for such violation or breach and regardless of any provision contained in this Purchase Agreement, the Buyer shall be entitled to injunctive and other equitable relief as a court may grant." By executing the Purchase Agreement, Kara Katz expressly agreed that engaging in competitive activities and disclosing confidential information would result in irreparable harm to FIS.

37.     The Purchase Agreement also provided that certain current and former employees, including Jay Katz, had executed nondisclosure agreements that would protect Clear Par's proprietary interests in its intellectual property.

### III.    JAY KATZ FORMS STORM NETWORKS, LLP WITH INVOLVEMENT FROM CLEAR PAR'S CUSTOMERS

38.     On August 9, 2006, Jay Katz incorporated Storm Networks, LLC in Delaware. Storm is a New York-based company "dedicated to providing innovative solutions that revolutionize the way global financial services companies do business in the U.S. and abroad." Jay Katz is the managing director of Storm. A copy of all documents regarding the incorporation of Storm Network on file with the Delaware Secretary of State's Office is attached hereto as Exhibit 2.

39.     In October 2008, Storm launched a product called Storm Loan Marketplace ("Storm Loan"). Jay Katz developed Storm Loan with equity investments from Bank of America, Credit Suisse, and Morgan Stanley, all of which are listed on Storm's website as partners.

40.     According to Storm's website, Storm Loan is an "online application service platform for buy and sell-side institutions participating in the corporate bank loan market" that will "substantially improve the efficiency of the secondary market for corporate loans by automating what was previously a cumbersome, manual process."

41.     Like ClearPar, Storm automates the loan trading process. Storm's clients receive a username and password to its site, just like ClearPar's customers do. According to the Storm website, "When an investor wants to do a trade with a bank, each party fills out a ticket." The Storm Loan system will then "generate an online confirm." Again, in

the same, or a substantially similar manner as with ClearPar, once a party sells off its final position, the system automatically removes the party.

42. Storm Loan offers a variety of tools to clients to manage their trades, including STORM Document Warehouse, which collects credit and trade-related documents into a central electronic location and STORM Tradelist, which reports trade data over the life of the trade.

43. Storm also aims to standardize the loan trade settlement process through the creation and use of its Master Agreement. In the past, loan settlement and trades could be delayed by parties' negotiation of loan terms, including when the trade will settle, what the terms of credit are, and penalties for breaking off the trade prematurely. Storm Loan's Master Agreement standardizes certain terms for all customers across all loan trades conducted using Storm Loan which eliminates time-consuming negotiations between financial institutions.

44. By drafting pre-set terms, Storm can settle loans more quickly than its competitors can. The Master Agreement will be used solely by Storm, thus giving it a competitive advantage over others in the industry.

45. Storm boasts that its platform "takes what could easily be a process of 10 days or more and compresses it into as little as 3 days."

46. Kara Katz is centrally involved in drafting and otherwise developing the standardized terms of the Master Agreement for exclusive use by Storm. In fact, the website of Kara Katz's law firm plainly discloses that the firm is involved with standardizing industry practices.

## IV. KARA KATZ'S ASSISTANCE TO STORM AND STORM'S DIRECT COMPETITION WITH CLEARPAR ARE CAUSING FIS CONTINUAL HARM

47. By signing the Purchase Agreement, Kara Katz expressly acknowledged that any violation of the confidentiality and non-competition clauses would cause an "irreparable injury" to FIS "for which a remedy at law would be inadequate." Kara Katz also agreed that a breach of these clauses would entitle FIS to such "injunctive and other equitable relief as a court may grant" in addition to "any relief at law which may be available" to FIS.

48. Kara Katz has harmed FIS by drafting and implementing the Master Agreement. By working on the Master Agreement, Kara Katz has directly managed, controlled and been affiliated with a business substantially similar to ClearPar's in violation of the Purchase Agreement.

49. Upon information and belief, Kara Katz has harmed FIS by providing confidential information about ClearPar's loan settlement procedures and its customer lists to Jay Katz and Storm. By disclosing this information, Kara Katz has breached the covenant of confidentiality as well as indirectly participated in a business substantially similar to ClearPar's in violation of the Purchase Agreement.

50. Kara Katz has also committed an independent violation of the terms of the Purchase Agreement by virtue of her indirect ownership of Storm. As one of the Sellers of Clear Par, Kara Katz expressly agreed that she would not "directly or indirectly, own, manage, control or participate in the ownership, management or control of, or be related or otherwise affiliated in any manner with, any business substantially similar to that presently engaged in by the Company." As the wife of Jay Katz, the founder and

managing director of Storm, Kara Katz "directly or indirectly" owns or is participating in the ownership of "a business substantially similar" to that of Clear Par in violation of the Purchase Agreement.

51. Upon information and belief, Kara Katz has also violated her implied at law duty as a seller of an ongoing business not to later usurp the business she purported to transfer by assisting Jay Katz and Storm in the solicitation of Clear Par customers.

52. Kara Katz did not obtain FIS's prior written consent to engage in competitive activities, as required by the Purchase Agreement, nor did FIS authorize Kara Katz to use or disclose the Company's intellectual property, including client lists, in any manner. In fact, FIS expressly forbade Kara Katz from direct or indirect competition and from using Clear Par's intellectual property in the Purchase Agreement.

53. FIS and Storm offer substantially similar products and employ similar methods to process financial transactions quickly. Storm provides services similar to FIS, but with the promise of standardization under the Master Agreement that Kara Katz drafted. The primary business of both FIS and Storm is the provision of services to investors and financial institutions designed to facilitate loan trading by reducing closing times and eliminating errors. Storm and ClearPar both will have the same customers and any business that Storm Loan gains will result in lost business and related revenue for ClearPar.

54. The similarities between the FIS and Storm platforms include an online interface, an electronic trade ticket and confirmation for transactions, a centralized electronic repository for documents, the ability for multiple parties to access trade

information, and the automatic updating of documentation and information on trading parties.

55. Jay Katz and Storm have harmed FIS by interfering with Clear Par's relationships with its customers.

56. Upon information and belief, as an owner of Clear Par, Kara Katz developed relationships with Clear Par clients at Clear Par's expense and also developed knowledge about the business of loan settlement transactions.

57. Upon information and belief, through his employment at Clear Par, and because he is married to Kara Katz, Jay Katz knew about Clear Par's business and relationships that the Company had with various financial institutions.

58. Upon information and belief, Jay Katz and Storm used confidential information about Clear Par and contacts that Kara Katz provided to him to solicit three of Clear Par's customers as co-owners of Storm, a competing business venture.

59. Upon information and belief, Jay Katz and Storm also used, and are using, confidential information that Kara Katz provided to Jay Katz in the creation and administration of Storm to garner additional business relationships for Storm.

60. Upon information and belief, through his employment at Clear Par, and because he is married to Kara Katz, Jay Katz knew that Kara Katz signed the Purchase Agreement and was aware of the terms it contained that forbid Kara Katz from using or disclosing confidential information, and from competing with Clear Par.

61. Upon information and belief, Jay Katz was also aware when he acquired his ownership interest in Storm that Kara Katz was contractually barred from maintaining

a direct or indirect ownership interest in, or participating in the ownership of, a business substantially similar to that of Clear Par.

62. Upon information and belief, Storm is seeking to enter into a sale or funding transaction in the immediate future. Such a transaction would expose critical assets of Clear Par, for which FIS paid substantial consideration, to Clear Par's competitors. The exposure of Clear Par's proprietary and confidential information on this scale would cause FIS irreparable harm.

## COUNT I
### (Breach of Contract)

63. Plaintiff repeats and realleges every allegation contained in the preceding paragraphs as if set forth herein in full.

64. Kara Katz signed the Purchase Agreement in exchange for consideration. The Purchase Agreement requires Kara Katz not to use or disclose any of Clear Par's intellectual property and confidential information without Clear Par's authorization and not to compete by directly or indirectly owning, managing, controlling or participating in the ownership, management or control of a substantially similar business. Kara Katz is competing with Clear Par by drafting the Master Agreement for Storm and has used and disclosed confidential information to benefit her husband and Storm.

65. Because of her marital relationship with Jay Katz, Kara Katz indirectly owns and participates in Storm because Jay Katz created and manages Storm.

66. As a result of Kara Katz's breach of contract, Plaintiff has been injured in an amount to be determined at trial.

67. Unless Kara Katz's violations are enjoined, FIS will be irreparably harmed.

68. FIS has no adequate remedy at law.

## COUNT II
### (Breach of Implied Covenant)

69. Plaintiff repeats and realleges every allegation contained in paragraphs 1-61 as if set forth herein in full.

70. Kara Katz is using confidential information she gained while a co-owner of Clear Par to solicit Clear Par's customers on behalf of Storm, thus impairing Clear Par's good will. Kara Katz has a duty as a former owner not to solicit former customers' goodwill that is implied at law and extends indefinitely.

71. As a result of Kara Katz's breach of implied covenant, Plaintiff has been injured in an amount to be determined at trial.

72. Unless Kara Katz's violations are enjoined, FIS will be irreparably harmed.

73. FIS has no adequate remedy at law.

## COUNT III
### (Tortious Interference with Contractual Relations)

74. Plaintiff repeats and realleges every allegation contained in paragraphs 1-61 of the Complaint as if set forth here in full.

75. Jay Katz and Storm have interfered with Kara Katz's contractual obligations under the Purchase Agreement. Kara Katz agreed, and is obligated under the covenant of non-competition contained in the Purchase Agreement, not to "directly or indirectly, own, manage, control or participate in the ownership, management or control of, or be related or otherwise affiliated in any manner with, any business substantially similar to that presently engaged in by the Company." Jay Katz and Storm were aware

that Kara was contractually obligated not to participate in the ownership or control of a competing business such as Storm.

76. By creating Storm, Jay Katz and Storm knowingly induced Kara Katz to breach her contract. Jay Katz owns a direct equity interest in Storm. Because Kara Katz is married to Jay Katz, she indirectly owns, manages and participates in the ownership of Storm, in violation of the terms of the Purchase Agreement.

77. Jay Katz and Storm have also interfered with FIS's contractual relations. FIS enters into individual contracts with financial institutions who conduct loan trades on ClearPar's platform, of which Defendants Jay Katz and Storm are aware. Jay Katz and Storm have intentionally interfered, to the detriment of FIS, with FIS's contractual relations with its customers in that Jay Katz and Storm have solicited, attempted to solicit and continue to solicit FIS's customers in an attempt to compete with FIS's business. Jay Katz and Storm's efforts have caused ClearPar's customers not to trade on the ClearPar platform, and therefore not to contract with Clear Par.

78. As a result of Jay Katz and Storm's tortious interference with FIS's and Kara Katz's contractual relations, Plaintiff has been injured in an amount to be determined at trial.

79. Unless Jay Katz and Storm's actions are enjoined, FIS will continue to suffer irreparable harm.

80. FIS has no adequate remedy at law.

## COUNT IV
### (Permanent Injunction)

81. Plaintiff repeats and realleges every allegation contained in paragraphs 1-61 of the Complaint as if set forth here in full.

82. Defendant Kara Katz has violated the Purchase Agreement's covenant of confidentiality by using and disclosing Clear Par's confidential and proprietary information. Kara Katz has violated the Purchase Agreement's covenant of non-competition by competing directly against Clear Par by participating in the creation of the Master Agreement. By virtue of her marriage to Jay Katz and the marital pooling of assets, Kara Katz has also violated the Purchase Agreement's covenant of non-competition by indirectly owning, participating in the ownership of, and managing Storm, a business that is substantially similar to Clear Par. Kara Katz is also violating her implied at law covenant not to solicit Clear Par customers after selling her interest in Clear Par.

83. Violations of the Clear Par Purchase Agreement, by definition, cause irreparable harm to FIS.

84. Defendants Jay Katz and Storm have benefitted, and will continue to benefit, from Kara Katz's work on the Master Agreement. The Master Agreement provides a competitive advantage to Jay Katz and Storm, which allows them to continue to interfere with Clear Par's business, thus harming FIS.

85. Unless Defendants Kara Katz, Jay Katz and Storm's actions are enjoined, FIS will continue to suffer irreparable harm.

86. FIS has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, FIS prays for judgment as follows:

1. For compensatory and punitive damages in an amount to be proven at trial;

2. For a preliminary and permanent injunction barring defendant Kara Katz from further violations of the Purchase Agreement between FIS and Kara Katz, among others, or from directly or indirectly assisting, participating in, managing, controlling or being affiliated with Storm or any other competitor of either FIS or its subsidiary Clear Par, including but not limited to working on any standardized Master Agreement or other services provided by or in the process of being developed by Storm and its affiliates;

3. For a preliminary and permanent injunction barring defendants Jay Katz and Storm from soliciting, using and/or benefiting from Kara Katz's work product generated in violation of the Purchase Agreement;

4. For a preliminary and permanent injunction barring defendants Jay Katz and Storm from further disclosing or otherwise disseminating any work product generated by Kara Katz in violation of the Purchase Agreement;

5. That any work product generated in violation of the Purchase Agreement, including any work product relating to any standardized Master Agreement, be turned over to, and held by, the Court pending the outcome of this suit; and

6. For such other and further relief as the Court deems appropriate, including interest, costs, disbursements and attorney's fees incurred herein, as permitted by law.

Respectfully submitted,

Dated: July 6, 2009        DEWEY & LEBOEUF LLP

                           By: /s/
                           Robert J. Alessi (Bar Roll No. 101019)
                           *ralessi@dl.com*

                           99 Washington Avenue, Suite 2020
                           Albany, NY 12210
                           Tel. (518) 626-9000
                           Fax (518) 626-9010

                           Attorneys for Plaintiff